USDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------- X
                                 :
IN RE MORGAN STANLEY TECHNOLOGY  :     02 Civ. 6153 (BSJ)
FUND SECURITIES LITIGATION       :
                                 :
-------------------------------- X
                                 :
IN RE MORGAN STANLEY INFORMATION :     02 Civ. 8579 (BSJ)
FUND SECURITIES LITIGATION       :
                                 :
-------------------------------- X
```

2/2/09

**OPINION AND ORDER**

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

This is a federal securities class action asserted by
two groups of Lead Plaintiffs, each of whom respectively
purchased shares of the Morgan Stanley Technology Fund (the
"Technology Fund") and the Morgan Stanley Information Fund
(the "Information Fund") (collectively, the "Funds").  The
Defendant entities are Morgan Stanley, Morgan Stanley & Co.
Incorporated ("MS&Co."), Morgan Stanley DW Inc. ("MSDWI"),
the Information Fund, the Technology Fund, Morgan Stanley
Investment Advisors Inc. ("MSIA"), Morgan Stanley
Investment Management Inc. ("MSIM"), and Morgan Stanley
Distributors Inc. (the "Distributor")  (collectively,
"Defendants").  Defendants move to dismiss Plaintiffs'
Second Amended Consolidated Complaints in In re Morgan
Stanley Technology Fund Securities Litigation, 02 Civ. 6153
(S.D.N.Y.), and In re Morgan Stanley Information Fund

1

<u>Securities Litigation</u>, 02 Civ. 8579 (S.D.N.Y.).  For the reasons that follow, the Court GRANTS the motion and dismisses the Complaints in their entirety.

**BACKGROUND**[1]

**I.   The Parties**

    **A.   Plaintiffs**

Lead Plaintiffs James Barenboim, John C. Armstrong, and Nina H. Armstrong ("Technology Fund Lead Plaintiffs") purchased shares of the Technology Fund during the Technology Fund Class Period of September 25, 2000 up to and including July 31, 2002.  (Technology Fund Compl. ("TF Compl.") ¶¶ 1, 19-23.)  Lead Plaintiffs Michael J. McDermott, Stephen B. Dornak, Dietmar H. Kubb, Lisette Vaessen, Emil H. Vaessen, and James M. Lindsay ("Information Fund Lead Plaintiffs") purchased shares of the Information Fund during the Information Fund Class Period of October 25, 1999 up to and including October 25, 2002.  (Information Fund Compl. ("IF Compl.") ¶¶ 1, 19-26.)

Both Second Consolidated Amended Complaints (the "Complaints"), which are nearly indistinguishable,[2] allege that Plaintiffs lost, in the aggregate, millions of dollars

---

[1] The following facts are taken from the allegations in Plaintiffs' Complaints.  They are assumed to be true for the purposes of this motion to dismiss.

[2]  Because the two Complaints are virtually identical, the Court addresses them together, except where otherwise noted.

on their purchases of Technology Fund and Information Fund
shares.

### B.   Defendants[3]

### Funds

The Technology Fund and the Information Fund are each
organized as registered open-ended mutual funds within the
Morgan Stanley family of mutual funds.  (TF Compl. ¶ 29; IF
Compl. ¶ 32.)  Each is owned by its shareholders.  The
Funds' stated objective for their shareholders is to
provide long-term capital appreciation.  (TF Compl. ¶ 29;
IF Compl. ¶ 32.)  According to the Technology Fund's
registration statement, prospectus, and Statements of
Additional Information ("SOAIs") (collectively, the "Funds'
Prospectus Materials"), the Technology Fund invests at any
given time primarily in common stocks of companies engaged
in technology and technology-related industries.  (TF
Compl. ¶ 29.)  According to the Information Fund's
Prospectus Materials, the Information Fund invests at any
given time primarily in common stocks of companies involved
in the communications and information industry.  (IF Compl.
¶ 32.)

---

[3]   The Technology Fund and Information Fund actions share all Defendants
in common, with the exception of the Funds themselves.

### Distributor

Defendant Distributor is the Funds' principal underwriter.  (TF Compl. ¶ 33; IF Compl. ¶ 36.) Distributor is a wholly-owned subsidiary of Morgan Stanley, and is a registered broker-dealer that facilitates the sale and redemption of Fund shares.  (TF Compl. ¶ 34; IF Compl. ¶ 37.)

### Investment Advisors

Defendants Morgan Stanley Dean Witter Advisors Inc. ("MSIA") and Morgan Stanley Investment Management Inc. ("MSIM"), also wholly-owned subsidiaries of Morgan Stanley, are registered investment advisors that manage and advise the Funds.  (TF Compl. ¶ 31; IF Compl. ¶ 34.)   The Funds annually contract with MSIA to perform investment management services.  (TF Compl. ¶ 32; IF Compl. ¶ 35.) MSIA, in turn, contracts with MSIM to invest the Fund's assets, including the placing of orders for the purchase and sale of Fund portfolio securities during part of the Class Period.[4]  (TF Compl. ¶ 32; IF Compl. ¶ 35.)   In this regard, MSIM acts as a sub-advisor to its contract with MSIA.

---

[4]   MSIA was formerly known as Morgan Stanley Dean Witter Advisors Inc. Its name changed on June 11, 2001.  (See Rosen Decl., Ex. 31 (Certificate of Amendment of Certificate of Incorporation, dated June 11, 2001).)

## Morgan Stanley DW Inc. ("MSDWI") and Morgan Stanley & Co. Incorporated ("MS&Co.")

MSDWI, a wholly-owned subsidiary of Morgan Stanley, was a registered broker-dealer with a sales force of individual registered representatives who sold, among other investment products, Morgan Stanley proprietary mutual funds. MS&Co., also a wholly-owned subsidiary of Morgan Stanley, is a full-service broker-dealer, with asset management and financial advisory subsidiaries, and businesses including retail and institutional brokerage, proprietary trading, market making, research, and investment banking and corporate finance services. (TF Compl. ¶ 7.) In April of 2007, MS&Co. and MSDWI merged. See Press Release, "Morgan Stanley Completes Merger of U.S. Broker-Dealers" (Apr. 3, 2007), available at http://www.morganstanley.com/about/press/articles/4700.html . Both Defendants MSDWI and MS&Co. are members of the New York Stock Exchange, the NASD, and all other principal exchanges, and are Morgan Stanley's principal operating subsidiaries. (TF Compl. ¶¶ 6, 27-28; IF Compl. ¶¶ 6, 30-31.)

### Morgan Stanley

Morgan Stanley, formerly known as Morgan Stanley Dean Witter & Co., is the publicly-traded parent company of all

the other Defendant entities in this action, except for the
Funds.

## II.  **The Allegations**

The Technology Fund and Information Fund actions were
brought as class actions pursuant to Rule 23(a) and (b)(3)
of the Federal Rules of Civil Procedure, on behalf of two
classes (the "Classes"), consisting of all persons and
entities that purchased shares of the Technology Fund or
Information Fund, respectively, during the relevant Class
Periods.  Defendants and any other affiliates of Morgan
Stanley, and the senior executive officers and directors of
Morgan Stanley and/or its affiliates, are excluded from the
Classes.  (TF Compl. ¶¶ 1, 45; IF Compl. ¶¶ 1, 48.)

As stated in the Complaints, throughout the Class
Periods, Morgan Stanley, MS&Co., and MSDWI publicly stated
that it maintained a so-called "Chinese Wall" between its
investment banking and research departments, a separation
that was meant to ensure that the research and
recommendations of its analysts were not influenced by
Morgan Stanley and its affiliates' interest in attracting
and retaining investment banking clients.  (TF Compl. ¶ 63;
IF Compl. ¶ 64.)  Yet, even before the Class Period, the

6

"Chinese Wall" crumbled and MS&Co.[5] acted in conjunction with and for the benefit of its investment banking departments. (TF Comp. ¶ 64; IF Compl. ¶ 65.) The alleged conflicts of interest were that Defendants individually and collectively had one or more of the following roles with respect to companies whose shares were included among the securities in the Funds' portfolios during the Class Periods: (1) they were underwriters for the securities of certain of the companies in the Funds' portfolios; (2) they were the investment bankers and corporate finance specialists for certain of the companies whose securities were in the Funds' portfolios; (3) they prepared and publicly disseminated research reports and recommendations on many of the companies whose shares were in the Funds' portfolios; and (4) they were seeking to obtain additional or first-time underwriting, investment banking, and corporate finance business from the companies whose shares were in the Funds' portfolios. (TF Compl. ¶ 8; IF Compl. ¶ 8.) Further, the Complaints allege that a material part of the total compensation paid to research analysts by MS&Co. was based on their securing investment banking

---

[5]  Hereinafter, as in the Complaints and Plaintiffs' opposition papers, "MS&Co." includes the respective research departments and issuance of research reports for both Defendants MS&Co. and MSDWI. It also includes Morgan Stanley in the context of Morgan Stanley's adoption of the research reports as its own. (Pls.' Mem. Opp'n Defs.' Mot. to Dismiss Second Consolidated Am. Compl. ("Pls.' Opp'n Mem.") at 8 n.9.)

business for the firm.  (TF Compl. ¶¶ 64, 66-93; IF Compl.
¶¶ 65, 67-94.)  Consequently, MS&Co. promoted the shares of
companies that were either Morgan Stanley clients or
potential clients, resulting in the artificial inflation of
the price of those companies' shares.  (TF Compl. ¶¶ 8-9,
62-65; IF Compl. ¶¶ 8-9, 63-66.)

The Complaints also contend that the Funds' portfolios
were loaded with Morgan Stanley-sponsored stocks – at least
eighty-five percent of the companies whose securities were
part of the Technology Fund's portfolio were covered by
Morgan Stanley research reports (TF Compl. ¶ 151(9)), and
at least seventy-five percent of the companies whose
securities were part of the Information Fund's portfolio
were covered by Morgan Stanley research reports (IF Compl.
¶ 151(9)).  In addition, the Complaints aver that Morgan
Stanley performed investment banking services resulting in
consummated transactions for more than thirty percent of
the companies whose securities were in each Fund.  (TF
Compl. ¶ 103; IF Compl. ¶ 108.)

Separate and apart from the conflicts of interests
asserted, the Complaints allege that Morgan Stanley engaged
in "laddering," which involved rewarding customers with
"hot" initial public offering ("IPO") shares when they
agreed to purchase additional shares in the aftermarket at

higher prices, thus inflating the aftermarket prices of

Morgan Stanley's and other co-conspirator's IPO offerings,

as well as research tie-ins that artificially inflated the

aftermarket share price of IPO stock for which the broker

was an underwriter of either the IPO or the secondary

offering.  (TF Compl. ¶ 125-41; IF Compl. ¶¶ 127-41.)

These IPO practices were purportedly not disclosed in the

Funds' Prospectus Materials.

Consequently, the Complaints allege that the Funds'

Prospectus Materials omitted or misstated the following

material information, inter alia:

> (1) that a material part of the total
> compensation paid to MS&Co. research analysts was
> based upon their securing/participation in
> investment banking business for the companies,
> and not upon the accuracy of their research about
> a given company or the quality of their research;
>
> (2) that MS&Co.'s decisions on initiating,
> maintaining, and terminating research coverage
> were made to acquire and maintain investment
> banking business from the companies covered by
> the reports, and not to disseminate objective
> research for potential purchasers of the
> security;
>
> (3) that the objectivity of these research
> reports, including investment rating given any
> particular security, was inherently and
> materially tainted by the aforesaid investment
> banking relationships and the attempts to
> maintain and obtain investment banking
> relationships;
>
> (4) that MS&Co. had significant investment
> banking relationships with a material number of

the companies whose securities were part of the
Funds' portfolios;

(5) that as to a material number of those
companies whose securities were part of the
Funds' portfolios, and with whom MS&Co. did not
have investment banking relationships, MS&Co.
sought and continued to seek investment banking
relationships;

(6) that MS&Co. issued research reports on the
overwhelming majority of companies whose
securities were part of the Funds' portfolios;

(7) that in at least nine stock offerings in
which MS&Co. was selected as lead underwriter for
companies in the Funds' portfolios, it paid a
certain portion of underwriting fees at the
issuer's direction to approximately 25 investment
banks to "guarantee" research coverage and thus
inflate the price of those shares;

(8) that Morgan Stanley had an economic incentive
to have the Funds invest in certain companies in
order to enhance MS&CO.'s opportunities to obtain
or retain investment banking business from those
companies without regard to whether they were
good investments;

(9) that Morgan Stanley had an economic incentive
to keep a portfolio position in a company in the
Funds if Defendants believed retaining ownership
of such company's securities would enhance
MS&Co.'s opportunities to obtain or retain
investment banking business from that company,
regardless of whether the security was a sound
investment and otherwise would have been sold by
Defendants; and

(10) that MS&Co.'s issuance of research reports
and ratings on various companies, and provision
of investment banking services for various
companies, as well as the extent to which other
Morgan Stanley funds had purchased the same
securities, affected purchases of securities in
the Funds' portfolios.

(TF Compl. ¶¶ 151(1)-(3),(6),(8)-(10),(12)-(14); IF Compl.
¶¶ 151(1)-(3),(6),(8)-(10),(12)-(14).)

**DISCUSSION**

**I.   Legal Standards**

**A.   Rule 12(b)(6)**

Under Rule 12(b)(6), a complaint will be dismissed if
there is a "failure to state a claim upon which relief can
be granted." Fed. R. Civ. P. 12(b)(6). The Court must
read the complaint generously, accepting the truth of and
drawing all reasonable inferences from well-pleaded factual
allegations. See York v. Ass'n of Bar of the City of N.Y.,
286 F.3d 122, 125 (2d Cir. 2002); see also Mills v. Polar
Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993). In
deciding a motion to dismiss, the Court is not limited to
the face of the complaint, but "may [also] consider any
written instrument attached to the complaint, statements or
documents incorporated into the complaint by reference,
legally required public disclosure documents filed with the
SEC, and documents possessed by or known to the plaintiff
and upon which it relied in bringing the suit." ATSI
Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d
Cir. 2007). "To survive dismissal, the plaintiff must
provide the grounds upon which his claim rests through
factual allegations sufficient 'to raise a right to relief

11

above the speculative level.'" Id. (quoting Bell Atl.
Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007)).

**B.   The Securities Act of 1933**

**1.   Section 11**

"The Securities Act of 1933 was designed to provide
investors with full disclosure of material information
concerning public offerings of securities in commerce, to
protect investors against fraud and, through the imposition
of specified civil liabilities, to promote ethical
standards of honesty and fair dealing." Ernst & Ernst v.
Hochfelder, 425 U.S. 185, 195 (1976) (citation omitted).
Section 11 of the Securities Act provides that any signer,
director of the issuer, preparing or certifying accountant,
or underwriter may be liable if "any part of the
registration statement, when such part became effective,
contained an untrue statement of a material fact or omitted
to state a material fact required to be stated therein or
necessary to make the statements therein not misleading."
15 U.S.C. § 77k(a).  "The section was designed to assure
compliance with the disclosure provisions of the
[Securities] Act by imposing a stringent standard of
liability on the parties who play a direct role in a
registered offering." Herman & MacLean v. Huddleston, 459
U.S. 375, 381-82 (1983).

Allegations that "material facts have been omitted" from a registration statement or "presented in such a way as to obscure or distort their significance" are sufficient to state a claim for violation of Section 11.  I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., 936 F.2d 759, 761 (2d Cir. 1991) (citation omitted).  Material facts may "include not only information disclosing the earnings and distributions of a company but also those facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities."  Kronfeld v. Trans World Airlines, Inc., 832 F.2d 726, 732 (2d Cir. 1987) (citation omitted).  The "central inquiry" in determining whether a statement is misleading under Section 11 is "whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the investment."  I. Meyer Pincus, 936 F.2d at 761 (citation omitted); see also Demaria v. Andersen, 318 F.3d 170, 180 (2d Cir. 2003).

Section 11(e), 15 U.S.C. § 77k(e), provides an affirmative defense for defendants who can prove that the loss in the value of a security is due to something other than the alleged misrepresentation or omission on which the Section 11 claim is premised.  It states

13

> that if the defendant proves that any portion or
> all of such damages represents other than the
> depreciation in value of such security resulting
> from such part of the registration statement,
> with respect to which his liability is asserted,
> not being true or omitting to state a material
> fact required to be stated therein or necessary
> to make the statements therein not misleading,
> such portion of or all such damages shall not be
> recoverable.

15 U.S.C. § 77k(e).  Although "not insurmountable,"
defendants' burden in establishing this defense is heavy
since "the risk of uncertainty" is allocated to defendants.
Akerman v. Oryx Commc'ns, Inc., 810 F.2d 336, 341 (2d Cir.
1987).

## 2.  Section 12

Section 12(a)(2) of the Securities Act, known prior to
the Private Securities Litigation Reform Act ("PSLRA") of
1995 amendments as Section 12(2), allows a purchaser of a
security to bring a private action against a seller that
"offers or sells a security . . . by means of a prospectus
or oral communication, which includes an untrue statement
of a material fact or omits to state a material fact
necessary in order to make the statements . . . not
misleading."  15 U.S.C. § 77l(a)(2).  The section entitles
the buyer

> to recover the consideration paid for such
> security with interest thereon, less the amount
> of any income received thereon, upon the tender

14

of such security, or for damages if he no longer
owns the security.

Id.; Commercial Union Assurance Co. v. Milken, 17 F.3d 608,

615 (2d Cir. 1994); see also Randall v. Loftsgaarden, 478

U.S. 647, 655 (1986) ("[Section] 12(2) prescribes the

remedy of rescission except where the plaintiff no longer

owns the security.").

Section 12 turns on status, not scienter: it imposes

liability without requiring "proof of either fraud or

reliance." Gustafson v. Alloyd Co., 513 U.S. 561, 582

(1995). Instead, plaintiff must show "only some causal

connection between the alleged communication and the sale,

even if not decisive." Metromedia Co. v. Fugazy, 983 F.2d

350, 361 (2d Cir. 1992) (citation omitted).

The PSLRA added an affirmative defense modeled after

Section 11 of the Securities Act. Goldkrantz v. Griffin,

No. 97 Civ. 9075(DLC), 1999 WL 191540, at *6 (S.D.N.Y. Apr.

6, 1999), aff'd, 201 F.3d 431 (2d Cir. 1999). The statute

prohibits recovery to the extent that

> the person who offered or sold such security
> proves that any portion or all of the amount
> recoverable . . . represents other than the
> depreciation in value of the subject security
> resulting from such part of the prospectus or
> oral communication, with respect to which the
> liability of that person is asserted.

15 U.S.C. § 77l(b).

15

Defendants may be liable under Section 12(a)(2) either for selling a security or for soliciting its purchase. First, Section 12 creates a cause of action against sellers who "passed title, or other interest in the security, to the buyer for value." Pinter v. Dahl, 486 U.S. 622, 642 (1988); see also Wilson v. Saintine Exploration & Drilling Corp., 872 F.2d 1124, 1126 (2d Cir. 1989), superceded by statute as recognized in Fisk v. SuperAnnuities, Inc., 927 F. Supp. 718, 729 n.7 (S.D.N.Y. 1996) (applying Pinter's § 12(1) analysis to what is now § 12(a)(2)); Capri v. Murphy, 856 F.2d 473, 478 (2d Cir. 1988) (same). To be liable as a seller, the defendant must be the "buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller." Pinter, 486 U.S. at 644 n.21.

Second, persons who are not in privity with the plaintiff may be liable if they "successfully solicit[ed] the purchase, motivated at least in part by a desire to serve [their] own financial interests or those of the securities owner." Id. at 647; see also Wilson, 872 F.2d at 1126; Commercial Union Assurance Co., 17 F.3d at 616. In finding that Section 12 included liability for solicitation, the Supreme Court observed that, "[t]he

16

solicitation of a buyer is perhaps the most critical stage
of the selling transaction . . . [and] the stage at which
an investor is most likely to be injured." Pinter, 486
U.S. at 646.

### 3.   Section 15

Section 15 of the Securities Act attaches liability to
"[e]very person who, by or through stock ownership, agency,
or otherwise, . . . controls any person liable" under
Sections 11 or 12 of the Securities Act.  15 U.S.C. § 77o.
To state a violation of Section 15, a plaintiff must plead
(1) an underlying primary violation of Sections 11 or 12 by
the controlled person; and (2) the defendant's control over
the primary violator. In re Deutsche Telekom AG Sec.
Litig., No. 00 Civ. 9475(SHS), 2002 WL 244597, at *5-6
(S.D.N.Y. Feb. 20, 2002) (noting intra-circuit split).
Section 15 provides an affirmative defense.  It exempts
from liability a person who "had no knowledge of or
reasonable ground to believe in the existence of the facts
by reason of which the liability of the controlled person
is alleged to exist."  15 U.S.C. § 77o.

## II.  Sections 11 and 12(a)(2) of the 1933 Act

Plaintiffs primarily allege that information was
omitted from the Funds' Prospectus Materials that would be
material to a reasonable investor in making a decision

17

whether to invest in the Funds.  Under Sections 11 and
12(a) of the Securities Act of 1933, 15 U.S.C. § 77k and 15
U.S.C. § 77l(a)(2), Plaintiffs argue that the Funds
consequently have a duty to make further disclosures.
Plaintiffs assert that they are entitled to relief because
Defendants did not comply with this duty.  For the reasons
that follow, the Court finds Plaintiffs' arguments
unpersuasive.

     Although Plaintiffs contend otherwise, it is well
established that there is no liability in the absence of a
duty to disclose, even if the information would have been
material.  Resnik v. Swartz, 303 F.3d 147, 154 (2d Cir.
2002) ("Disclosure of an item of information is not
required . . . simply because it may be relevant or of
interest to a reasonable investor.  For an omission to be
actionable, the securities laws must impose a duty to
disclose the omitted information.") (citing In re Time
Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993));
In re Merrill Lynch & Co., Inc. Research Reports Sec.
Litig., 272 F. Supp. 2d 243, 248 (S.D.N.Y. 2003) ("In re
Merrill Lynch & Co.") ("To state a claim under Sections 11
and 12(a)(2), a plaintiff must allege that the defendants
had a legal obligation to disclose the allegedly omitted
information.").  Thus, the threshold question under these

18

circumstances is whether the Funds had a duty to disclose the allegedly material information.

The "material facts" that Defendants purportedly failed to disclose fall into two general categories: (1) information about the conflicts of interest facing MS&Co.'s research analysts, with respect to investment banking activities and considerations; and (2) Defendants' IPO practices that allegedly inflated the price of the Funds' portfolio shares.  (See Pls.' Opp'n Mem. at 13.) There are two accepted methods of determining whether a duty exists to disclose information.  First, a duty to disclose information may be imposed by statute or by regulation.  See, e.g., 15 U.S.C. § 77k (stating that a person is liable when a registration statement omits a material fact "required to be stated therein").  Second, a duty to disclose may arise when additional information is needed to make another statement, whether required or voluntarily made, not misleading.  The Court analyzes each in turn.

### A.   Required Disclosure

#### 1.   Form N-1A

Plaintiffs allege that Defendants had an obligation to disclose the omitted facts pursuant to Form N-1A.  (Pls.' Opp'n Mem. at 21.)  Form N-1A governs disclosures in mutual

19

fund registration statements and prospectuses.  The general pronouncement to Form N-1A states: "[t]he purpose of the prospectus is to provide essential information about the Fund in a way that will help investors to make informed decisions about whether to purchase the Fund's shares described in the prospectus."  (TF Compl. ¶ 155; IF Compl. ¶ 155 (emphasis added).)  It is this "essential information" language upon which Plaintiffs rely.

Form N-1A's statement of purpose, however, is not itself a substantive disclosure requirement.  Instead, Form N-1A designates thirty categories of information that must be disclosed in a Fund's prospectus or SOAI, including information concerning the existence of affiliate relationships between a mutual fund and its advisor, principal underwriter, and brokers.  For example, a fund must disclose: the name of any affiliates of the fund who are also affiliates of the advisor, as well as the nature of those relationships; whether any affiliate of the fund is also an affiliate of the principal underwriter; and the aggregate dollar amount of brokerage commissions paid by the fund during its three most recent fiscal years to any broker "[t]hat is an affiliated person of the [f]und or an affiliated person of that person; or [a]n affiliated person of which is an affiliated person of the [f]und, its

investment advisor, or principal underwriter." (Rosen
Decl., Ex. 36 (SEC Form N-1A), at Items 14, 16.)  Given the
specificity of the requirements set forth in Form N-1A,
Plaintiffs' argument that the alleged disclosures are
required by the Form's general directive to disclose
"essential information" to assist an investor in comparing
the fund with others, is unpersuasive.  Cf. TSC Indus.,
Inc. v. Northway, Inc., 426 U.S. 438, 449 n.10 (1976)
("[T]he SEC's view of the proper balance between the need
to insure adequate disclosure and the need to avoid the
adverse consequences of setting too low a threshold for
civil liability is entitled to consideration.").

        In this regard, the Complaints do not allege that the
above-described information was actually omitted from the
disclosures made by the Funds.  Instead, the Funds'
prospectuses disclose that their investment advisors and
underwriters are both wholly-owned subsidiaries of Morgan
Stanley, and that "[b]rokerage transactions in securities
listed on exchanges . . . may be effected through Morgan
Stanley DW, Morgan Stanley & Co. and other affiliated
brokers or dealers."  (Rosen Decl., Ex. 18, at 19-20, 27;
see also Rosen Decl., Ex. 8, at 20-21.)  As the rules
require, Part C of the registration statement also details
the other professional affiliations of officers of the

Funds' investment advisors, including their positions with other Morgan Stanley businesses.  (See, e.g., Rosen Decl., Ex. 16, at Item 26; Rosen Decl., Ex. 19, at Item 26; Rosen Decl., Ex. 9, at Item 26; Rosen Decl., Ex. 6, at Item 26; Rosen Decl., Ex. 3, at Item 26.)  Likewise, the Funds prospectuses indicate that the Funds pay "the Investment Manager a monthly management fee . . . based on the Fund's average daily net assets."  (Rosen Decl., Ex. 1, at 6; Rosen Decl., Ex. 2, at 19.)

As to the information Plaintiffs do contend that Defendants failed to disclose, the Court concludes that Form N-1A does not require its disclosure.  The gravamen of Plaintiffs' claims is that a broker-dealer firm owned by the same financial services company that owns the Funds' investment advisors engaged in acts and practices that created conflicts of interest for its research analysts with respect to investment banking activities and considerations.  (See Pls.' Opp'n Mem. at 11-12.)  More specifically, the Complaints allege that: MS&Co. had significant investment banking relationships with a material number of the companies whose securities were part of the Funds' portfolios; MS&Co. issued research reports on many of the securities held in the Funds' portfolios, and, in some instances, MS&Co. allegedly purchased research

coverage and/or issued falsely positive reports; a material
part of the total compensation paid to the research
analysts by MS&Co. was based on their securing investment
banking business for the firm, thus creating an incentive
for Defendants to select stocks based materially on
investment banking concerns and not on the soundness of the
investment; and Morgan Stanley, MS&Co. and MSDWI failed to
maintain the "Chinese Wall" between the companies'
investment banking and research departments.

      As an initial matter, Form N-1A, by its terms, does
not require Defendants to disclose that the Fund invested
in the securities of companies with which MS&Co. had an
investment banking relationship.  When the court in In re
Merrill Lynch & Co. was confronted with this issue, it
concluded:

> The first fault claimed is that Defendants failed
> to disclose that the Fund's broker-dealer
> affiliate provided investment banking services to
> companies in which the Fund invested.  Yet
> Plaintiff has not and cannot identify any SEC
> regulation or other legal authority that would
> require a mutual fund to disclose that
> information.

272 F. Supp. 2d at 248-49.  In coming to this conclusion,
the court reasoned, inter alia, that "[t]he absence of such
a requirement is not surprising.  It has been well-
recognized for decades that many mutual fund investment

advisors are affiliated with broker-dealers and investment
banks." Id. at 249.

Similarly, the court in In re Merrill Lynch & Co. held
that Defendants – a mutual fund, its directors, its
investment advisor and affiliates, and the advisor's
corporate parent and broker-affiliate – had no duty to
disclose that the broker-dealer affiliate issued
purportedly misleading research reports on many of the
securities held in the mutual funds' portfolios. Id. at
250-52. As in this case, the plaintiffs argued that the
inherently conflicted research reports inflated the market
price of the securities of a material number of companies
in the fund's portfolio, thus inflating the price paid by
the class when they purchased the mutual fund's shares.
Id. at 250. Although the court in In re Merrill Lynch &
Co. dismissed the alleged duty to disclose on the ground
that the information regarding the purported conflict of
interest was, at the very least, public knowledge, see id.,
the Court finds that Plaintiffs' claim fails for the
independent reason that Form N-1A does not require
disclosure that an affiliate of the fund publishes research
coverage on portfolio companies. Further, the Court notes
that firms have no duty to accuse themselves of unproven,
allegedly illegal policies, In re Am. Express Shareholder

Litig., 840 F. Supp. 260, 269 (S.D.N.Y. 1993); In re Axis
Capital Holdings Ltd. Sec. Litig., 456 F. Supp. 2d 576, 587
(S.D.N.Y. 2006), and accordingly, the Court finds that
Defendants had no duty to disclose that MS&Co. issued
purportedly misleading research reports on securities held
in the Funds' portfolios.

       With respect to broker compensation, courts in this
District have held that Form N-1A does not impose a
disclosure obligation with respect to broker compensation
or revenue-sharing arrangements, see, e.g., Morgan Stanley
& Van Kampen Mut. Fund Sec. Litig., No. 03 Civ. 8208, 2006
WL 1008138, at *7 (S.D.N.Y. Apr. 18, 2006) (finding that
Form N-1A requires disclosure of total fees paid by
investors and total commissions paid by the fund, but not
of how compensation is allocated or of the existence of
sales contests and management bonuses); In re Merrill Lynch
Inv. Mgmt. Funds Sec. Litig., 434 F. Supp. 2d 233, 238
(S.D.N.Y. 2006), or, for that matter, disclosure of
internal incentive structures, Hoffman v. UBS-AG, 2008 WL
4684168, at *5 (S.D.N.Y. Oct. 22, 2008) ("There is no duty
to disclose the incentives that a company provides its own
employees to encourage those employees to sell specific
products.").

Neither have Plaintiffs alleged facts sufficient to support their allegations that Defendants chose certain companies for the Fund in order to enhance MS&Co.'s investment banking business.  "The allegation that [MS&Co.] provided investment banking services and issued research reports for many companies in the Fund's portfolio would not support a finding that the Fund's investment managers selected those companies to promote [MS&Co.'s] investment banking business."  In re Merrill Lynch & Co., 272 F. Supp. 2d at 252.  The Funds' investment objectives are to seek long-term capital appreciation by investing in technology and technology-related industries, or companies in the communications and information industry.  Plaintiffs have not alleged any facts demonstrating that the companies held by the Funds failed to satisfy this criterion.  Indeed, many of the companies in which the Funds invested are well-known companies in the technology and/or communications sectors.  (See Tech. Fund Compl., Ex. 1, at 3-6, 8, 10; Info. Fund. Compl., Ex. 1, at 1-5, 8, 10-12, 17.) Moreover, Plaintiffs' evidence accompanying the Complaints – charts identifying the Funds' positions in various securities – evinces that, in some instances, the Funds' investments were made before any investment banking activity and, in other instances, the investment advisors

of the Fund sold holdings in companies in which they had
invested, notwithstanding the existence of investment
banking relationships or research coverage during the Class
Periods.[6]   (See Defs.' Mem. at 16.)  And, as one of the
world's largest full-service registered broker-dealers,
MS&Co. provided investment banking services and issued
research reports for many of the world's technology and
communication companies.  "That the companies overlap
should come as no surprise."  In re Merrill Lynch & Co.,
272 F. Supp. 2d at 253.

Finally, with respect to Plaintiffs' assertion that
Defendants should have disclosed the disintegration of the
"Chinese Wall" between the investment bankers and the
research analysts, Plaintiffs fail to identify any legal
authority that would require disclosure of this
information.  Plaintiffs allude to Regulation M, 17 C.F.R.
242.100 et seq., but, for the reasons described infra, this
regulation fails to support Plaintiffs' claim.[7]   (See Pls.'

---

[6]   The charts also do not reveal whether the research coverage for each
stock spanned all or part of the Class Period, whether the investment
analysts recommended buying each company in question, or whether their
ratings ever changed.
[7]   The Complaint also refers to the National Association of Securities
Dealer ("NASD") rules.  Neither the Funds nor their advisors are
members of the NASD, and therefore are not governed by its rules and
regulations.  Moreover, the NASD Rule governing "Communications with
the Public" - Rule of Conduct 2210 - does not cover registration
statements and prospectuses.  Accordingly, no duty to disclose the
purported omissions arises under this body of law.

Opp'n Mem. at 24 n.14; Part II.A.2 (discussing Regulation M).)

### 2.   Other Securities Laws and Regulations

Apart from Form N-1A, there are additional securities laws and regulations that govern the interaction between asset manager and broker-dealers.  For example, Section 17 of the 1940 Act, 15 U.S.C. § 80a-17, and its attendant rules provide a comprehensive set of regulations governing securities transactions between a registered investment company and an affiliate.  Section 17(a) prohibits the purchasing, selling, and borrowing of securities between a registered investment company and any affiliated person, promoter, or principal underwriter for the investment company.  15 U.S.C. § 80a-17(a)(1); 15 U.S.C. § 80a-17(a). Section 17(a)(1), however, provides exceptions for three types of sales by affiliates to mutual funds, and Section 17(c) contains two additional exceptions.  15 U.S.C. § 80a-17(a)(1); 15 U.S.C. § 80a-17(a),(c).  Further, the SEC has granted exemptions for ten specific types of transactions, including those between an investment company and its wholly owned subsidiary, Rule 17a-3; those between an investment company and a portfolio affiliate, provided that no enumerated person, or affiliate of such person, is a party to the transaction, Rule 17a-6; and those between

28

affiliated investment companies, Rule 17a-7.  17 C.F.R.

§§ 270.17a-1 – 270.17a-10.  In short, there is no rule or

regulation that contains a requirement that mutual funds

separately identify a transaction with its affiliates or

provide other information about the business activities of

relationships of those affiliates.  See In re Merrill Lynch

& Co. Research Reports Sec. Litig., 272 F. Supp. 2d at 249.

     Likewise, two additional SEC rules that address

dealings between funds and affiliates – Rule 10f-3 under

the 1940 Act and Regulation M under the Securities and

Exchange Act – do not prohibit any transaction in which the

Funds engaged, or require disclosures of the type

Plaintiffs demand.  Rule 10f-3, 17 C.F.R. §§ 270.10f-3,

provides a limited exemption for investment companies to

the general prohibitions of Section 10(f), 15 U.S.C. § 80a-

10(f), which is designed to prevent underwriters from

"dumping" unmarketable securities into affiliated mutual

funds by prohibiting a registered fund from purchasing

securities during the existence of an underwriting or

selling syndicate, even from an unaffiliated person, if a

principal underwriter of the security is an affiliate of

the fund.  To qualify for the exemption, an investment

company must satisfy twelve conditions relating to timing,

price, reasonable commission, the entity from whom the

securities are purchased, and percentage limitations.   17

C.F.R. § 270.10f-3(c).   Rule 10f-3 also charges the board

of directors of a fund with approving the procedures

pursuant to which purchases may be affected, and with

ensuring that such procedures are followed.   17 C.F.R.

§ 270.10f-3(c)(10).   None of the conditions of Rule 10f-3,

however, imposes a prospectus disclosure obligation.

Similarly, Regulation M prohibits issuers,

distribution participants, and their affiliates from

purchasing securities during restricted periods prior to

and during a public offering.   A limited exclusion exists

"for the benefit of multi-service financial institutions

(particularly investment advisor and investment company

affiliates," which permits a mutual fund to purchase

covered securities during the restricted period if their

affiliated distribution participant "creates an appropriate

information barrier between them."   Bloomenthal & Woolf,

Securities and Federal Corporate Law § 8:107, Affiliated

Purchasers (2d ed. 2007).   The information barrier requires

that the distribution participant adopt and enforce written

policies and procedures "reasonably designed to prevent the

flow of information to or from the affiliate that might

result in a violation" of Regulation M.   17 C.F.R.

§ 242.100(b)(3)(i)(A).   Regulation M, however, does not

30

mandate the disclosure of the details of such transactions.[8]
The Court also observes that Regulation M requires an
information barrier between the fund manager and the IPO
distribution participant who is the manager's affiliate.
Id.  Here, however, Plaintiffs fault the crumbling of a
"Chinese Wall" - a type of information barrier - between a
fund manager's investment bank and research analyst
affiliates.  This alleged "Chinese Wall" is one step
removed from the barrier described in Regulation M.

    In conclusion, Plaintiffs have not introduced
regulatory or judicial authority that indicates that they
have a viable claim under §§ 11 and 12(a)(2) for
Defendants' failure to uphold a duty of disclosure.[9]

---

[8]   Although Plaintiffs contend that Regulation M is not relevant because
"[t]his case has nothing to do with the restricted period after an
[initial public offering]" (Pls.' Opp'n Mem. at 24 n.14), the Court
disagrees.  Regulation M is relevant because of Plaintiffs' "laddering"
scheme allegations, which involve schemes to manipulate the aftermarket
trading of securities.  Furthermore, regardless of timing, Regulation M
is notable because it does not place any limits on a mutual fund's
purchase of securities under the circumstances of this case.
[9]   Because the Court concludes that Plaintiffs have not shown that they
have a claim based upon Defendants' affirmative duty to disclose under
§§ 11 and 12(a)(2), the Court need not reach Defendants' alternative
argument that Plaintiffs' theory is inconsistent with the settlement of
a Securities Exchange Commission ("SEC") enforcement action against
MS&Co.  (See Defs. Mem. at 34-38.)  Defendants' additional arguments
concerning the Sarbanes Oxley Act of 2002, Pub. L. No. 107-204, 116
Stat. 745, and subsequent regulatory action also need not be discussed
because this regulatory scheme post-dates the relevant Class Periods
and/or does not address prospectus requirements.

31

Accordingly, the Court turns to whether the duty is derived from a need to correct materially misleading statements.[10]

## B. Disclosure Required to Render Statements Not Misleading

Plaintiffs allege that the Prospectus Materials contained information that misled investors because the Funds did not disclose other, contextual information. Specifically, Plaintiffs claim that the Funds' offering documents state that their main investment strategy was "long term capital appreciation" (TF Compl. ¶¶ 143-45; IF Compl. ¶¶ 143-45), and refer in passing to unspecified "additional statements concerning the Funds' investment objectives, strategies and risks, as well as the Board of Trustees' role in managing the Funds" (Pls.' Opp'n Mem. at 25). Plaintiffs assert that these statements are rendered materially misleading as a result of the omitted information regarding, primarily, that the Funds were investing in a market affected by the acts of MS&Co.'s analyst and investment banking divisions. (Pls.' Opp'n Mem. at 25.)

---

[10]   The Court notes that the presence of interlocking officers and directors between the Funds and other Morgan Stanley affiliates may provide "a unique situation that might support an expansion of existing disclosure duties on these facts." J&R Marketing, SEP v. General Motors Corp, 2007 WL 655291, at *6 (E.D. Mich. Feb. 27, 2007).  But because Plaintiffs are claiming liability under §§ 11 and 12(a)(2), which essentially impose strict liability upon issuers for material misstatements or omissions, some legal authority beyond mere assertions that a duty should lie is needed.  Id.

To the extent that Plaintiffs characterize sections of
the offering materials as "misstatements," this
characterization is based on the alleged omissions from
these materials.  Indeed, Plaintiffs focus their challenge
on the omitted information, which Plaintiffs contend
"clearly rendered the Prospectuses' incomplete disclosures
materially misleading."  (Pls.' Opp'n Mem. at 26.)  Because
Plaintiffs' claims, regardless of how they are
characterized, are ones of omission, the Court's analysis
concerning Defendants' duty to disclose the purportedly
omitted material is applicable here.  In re Merrill Lynch &
Co., 272 F. Supp. 2d at 248 n.3.

Even if the Court were to consider Plaintiffs'
conclusory allegations that the Prospectus Materials were
materially misleading because of the untrue investment
strategy and objectives, risks, and Board of Trustees' role
in managing the Funds, Plaintiffs do not plead facts
sufficient to show that Defendants had a duty to disclose
this information.  First, as discussed supra, Plaintiffs
have not alleged any facts demonstrating that the companies
held by the Fund did not satisfy the Funds' criteria.
Second, there are no allegations that any of the Funds'
investor advisors were aware of the alleged conflicts of
interest between the sell-side research and banking

subsidiary of Morgan Stanley.  See id. at 252-53.[11]  Without

such an allegation, Plaintiffs cannot show that statements

in the Prospectus Materials about the Funds' "strategies

and risk" were rendered misleading by omission of the fact

that certain affiliates provided investment banking

services to a percentage of companies in the Funds'

portfolios.[12]  In other words, the Funds advisors' opinions

were accurate according to their perception of investment

strategy and risk.  Cf. In re WorldCom, Inc. Sec. Litig.,

303 F. Supp. 2d 385, 390 (S.D.N.Y. 2004) (holding that UBS,

a third-party underwriter that issued securities whose

value depended entirely on the financial fortunes of

WorldCom, was not liable for WorldCom's misstatements of

its financial results because UBS never represented the

accuracy of those financial statements).

    Finally, the prospectuses do disclose the other

professional affiliations of officers of the Funds'

investment advisors, including their positions with other

Morgan Stanley businesses.  Defendants were therefore

making a true statement regarding the officers'

---

[11]   To the extent that Plaintiffs urge that In re Merrill Lynch & Co. is
wrongly decided, the Court finds this argument to be without merit.
[12]   Although the parties disagree on the pleading standards for the
instant action, the Court notes that whether the heightened pleading
requirements of Rule 9(b) or the liberal standard of Rule 8(a) is
applied, the fact that Plaintiffs have not alleged that any of the
Funds' investor advisors were aware of the alleged conflicts of
interest renders the Complaints inadequate as to how they are
misleading.

professional ties.  To the extent that Plaintiffs argue

that Morgan Stanley and its affiliates made public comments

regarding its "Chinese Wall," the Court observes that

Section 12 liability is limited to oral communications

"related to a prospectus or initial offering."  Ballay v.

Legg Mason Wood Walker, Inc., 925 F.2d 682, 688 (3d Cir.

1991).  To permit recovery outside of this narrow

definition would permit recovery for the same conduct that

is covered by Section 10(b), but without the requirements

of scienter, reliance, or loss causation.  Id. at 689.

    In sum, Plaintiffs have failed to plead any material

omissions or misstatements that Defendants had a duty to

disclose.  In the absence of such a duty, the Court need

not address the other alleged deficiencies in the

Complaints – namely, that Plaintiffs have failed to

demonstrate loss causation and that the Complaint does not

meet the heightened pleading standards of Rule 9(b).

### III. Liability of Morgan Stanley, MS&Co., the Funds, MISA and MSIM as Statutory Sellers under Section 12(a)(2)

    Section 12(a)(2) of the Securities Act imposes

liability on a person who sells or offers a security

pursuant to a false or misleading prospectus.  15 U.S.C.

§ 771(a)(2).[13]  Yet, there is no liability under Section
12(a)(2) if there is no duty to disclose the allegedly
false or misleading information.  In re Time Warner Inc.
Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993) (an actionable
claim under the Securities Act or the Exchange Act must
plead an omission that involves information that the
defendant has a duty to disclose); see also Capri v.
Murphy, 856 F.2d 473, 478 (2d Cir. 1988) (under § 12(2),
sellers' "material misrepresentations and omissions render
them strictly labile to plaintiffs.").  Because this case
is resolved by the Court's holding that Defendants did not
breach a duty to disclose, the Court does not have occasion
to address Plaintiffs' "statutory seller" claim.

## IV.  Control Person Liability

Plaintiffs also asserted control person liability
against Morgan Stanley and other affiliate Defendants under
§ 15 of the Securities Act of 1933.  Section 15, however,
grounds liability of control persons on the corporation
being found liable under Section 11 or 12.  See 15 U.S.C.
§ 77o.  Because Plaintiffs' Section 11 and 12 claims

---

[13]  "(a) Any person who . . . (2) offers or sells a security . . . by
means of a prospectus or oral communication, which includes an untrue
statement of a material fact or omits to state a material fact
necessary in order to make the statements, in the light of the
circumstances under which they were made, not misleading . . ., shall
be liable . . . to the person purchasing such security from him. . . ."
15 U.S.C. § 771(a)(2).

against Defendants are without merit, their claim for
control person liability is also dismissed.

### CONCLUSION

For the foregoing reasons, Defendants' motions to
dismiss the Complaints are granted.  The Clerk of the Court
is directed to close case number 02 Civ. 8579 and case
number 02 Civ. 6153.

**SO ORDERED:**

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

Dated:    New York, New York
          February 2, 2008

37