MANDATE

02 cv 6153(BSJ)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: February 19, 2010

# UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 25th day of January, two thousand and ten.

PRESENT: Joseph M. McLaughlin,
Richard C. Wesley,
*Circuit Judges,*
Lawrence E. Kahn,*
*District Judge.*

---

In Re: Morgan Stanley Information Fund Securities Litigation

James M. Lindsay, Michael J. McDermott, Stephen B. Dornak, Dietmar H. Kubb, Lisette Vaessen, and Emil H. Vaessen, on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants,*

-v.-

Morgan Stanley, Morgan Stanley & Co., Inc., Morgan Stanley DW Inc., Morgan Stanley Technology Fund, Morgan Stanley Investment Advisors Inc., Morgan Stanley Investment Management Inc., and Morgan Stanley Distributors, Inc.,

*Defendants-Appellees.*

**JUDGMENT**
Docket Number: 09-0837-cv
09-0858-cv

---

In Re: Morgan Stanley Technology Fund Securities Litigation

John C. Armstrong, Nina H. Armstrong and James Barenboim, on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants,*

-v.-

Morgan Stanley, Morgan Stanley & Co., Inc., Morgan Stanley DW Inc., Morgan Stanley Technology Fund, Morgan Stanley Investment Advisory Inc., Morgan Stanley Investment Management Inc., and Morgan Stanley Distributors, Inc.,

*Defendants-Appellees.***

---

* The Honorable Lawrence E. Kahn, United States District Court for the Northern District of New York, sitting by designation.

**The Clerk of the Court is respectfully directed to amend the official captions in both actions to conform to the captions listed above.

MANDATE ISSUED ON 02/22/2010

The appeal in the above-captioned case from an order of United States District Court for the Southern District of New York having been argued on the district court record and the parties' briefs. Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that the order of the District Court is AFFIRMED in accordance with the opinion of this Court.

FOR THE COURT,
Catherine O'Hagan Wolfe,
Clerk

UNITED STATES SECOND CIRCUIT COURT OF APPEALS

Catherine O'Hagan Wolfe

Joy Fallek, Administrative Attorney

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

UNITED STATES SECOND CIRCUIT COURT OF APPEALS

Catherine O'Hagan Wolfe

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

UNITED STATES COURT OF APPEALS
FILED
JAN 25 2010
Catherine O'Hagan Wolfe, Clerk
SECOND CIRCUIT

---

August Term, 2009

(Argued: November 13, 2009 Decided: January 25, 2010)

Docket Nos. 09-0837-cv, 09-0858-cv

(consolidated for disposition)

---

IN RE MORGAN STANLEY INFORMATION FUND SECURITIES LITIGATION, No. 09-0837-cv,

James M. Lindsay, Michael J. McDermott, Stephen B. Dornak, Dietmar H. Kubb, Lisette Vaessen, and Emil H. Vaessen, on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants,*

- v. -

Morgan Stanley, Morgan Stanley & Co., Inc., Morgan Stanley DW Inc., Morgan Stanley Information Fund, Morgan Stanley Investment Advisors Inc., Morgan Stanley Investment Management Inc., and Morgan Stanley Distributors, Inc.,

*Defendants-Appellees.*

---

IN RE MORGAN STANLEY TECHNOLOGY FUND SECURITIES LITIGATION, No. 09-0858-cv,

John C. Armstrong, Nina H. Armstrong, and James Barenboim, on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants,*

- v. -

Morgan Stanley, Morgan Stanley & Co., Inc., Morgan Stanley DW Inc., Morgan Stanley Technology Fund, Morgan Stanley Investment Advisors Inc., Morgan Stanley Investment Management Inc., and Morgan Stanley Distributors, Inc.,

*Defendants-Appellees.**

---

Before:

McLAUGHLIN and WESLEY, *Circuit Judges*, and KAHN,** *District Judge*.

Plaintiffs appeal from a February 2, 2009 order of the United States District Court for the Southern District of New York (Jones, J.), which dismissed their claims relating to two Morgan Stanley mutual funds brought pursuant to sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77*l*(a)(2), 77o. The district court held that plaintiffs had not identified any legal basis that required defendants to disclose in the funds' offering documents information that related primarily to an affiliated Morgan Stanley broker-dealer.

AFFIRMED.

---

* The Clerk of the Court is respectfully directed to amend the official captions in both actions to conform to the captions listed above.

** The Honorable Lawrence E. Kahn, United States District Court for the Northern District of New York, sitting by designation.

---

DANIEL W. KRASNER (Jeffrey S. Nobel and Nancy A. Kulesa, Izard Nobel LLP, Hartford, Connecticut; Robert B. Weintraub, Wolf Haldenstein Adler Freeman & Herz LLP, New York, New York, *on the brief*), Wolf Haldenstein Adler Freeman & Herz LLP, New York, New York, *for Plaintiffs-Appellants in both actions.*

RICHARD A. ROSEN (Walter Rieman, *on the brief*), Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York, *for Defendants-Appellees in both actions.*

MARK PENNINGTON (David M. Becker, Mark D. Cahn, Jacob H. Stillman, *on the brief*), *for amicus curiae Securities and Exchange Commission.*

---

WESLEY, *Circuit Judge*:

These cases concern the boundaries of disclosure obligations in registration statements and prospectuses filed on Form N-1A pursuant to the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77a *et seq.* In separate but substantially similar putative class actions, two groups of plaintiffs brought claims under sections 11, 12(a)(2), and 15 of the Securities Act. *In re Morgan Stanley Info. Fund Sec. Litig.*, No. 02 Civ. 8579 (S.D.N.Y.) ("Info. Fund Action"); *In re Morgan Stanley Tech. Fund Sec. Litig.*, No. 02 Civ. 6153 (S.D.N.Y.) ("Tech. Fund Action"). With the

exception of the Morgan Stanley mutual fund specified in the caption of each case, the defendants are identical in both actions. Both groups of plaintiffs allege that defendants failed to make certain disclosures relating to the mutual funds that are required by the federal securities laws.

In a consolidated decision, the United States District Court for the Southern District of New York (Jones, J.) granted defendants' motions to dismiss plaintiffs' Second Amended Consolidated Complaints. *In re Morgan Stanley Tech. Fund Sec. Litig.*, 643 F. Supp. 2d 366, 369 (S.D.N.Y. 2009). The district court held that plaintiffs' failure to identify unlawful omissions in the mutual funds' registration statements or prospectuses doomed their claims. *Id.* at 381-82.

In this appeal, plaintiffs argue that the district court erred by rejecting their omissions-based legal theory. However, the Securities and Exchange Commission ("SEC" or "Commission") has appeared before us as an amicus curiae and opined that neither the Securities Act nor Form N-1A required defendants to disclose the information that plaintiffs allege was omitted. The Commission's position is consistent with both its prior interpretations of Form N-1A

and the decision below, it is entitled to judicial deference, and we find it persuasive. Moreover, a careful review of plaintiffs' allegations reveals that the true object of their claims is the alleged malfeasance of the mutual funds' affiliated broker-dealer entities and not the public offerings conducted by the funds themselves. We decline to expand liability under sections 11, 12(a)(2), and 15 to require issuers and offering participants to make disclosures regarding affiliates that are not otherwise called for by the securities laws. Therefore, we affirm.

## I. BACKGROUND

The focus of these class actions is, at least nominally, two open-ended Morgan Stanley mutual funds: defendant Morgan Stanley Information Fund ("Info. Fund") and defendant Morgan Stanley Technology Fund ("Tech. Fund," collectively with the Info. Fund, the "Funds"). Plaintiffs have not disputed the district court's finding that the operative pleadings in these two cases are "virtually identical." *In re Morgan Stanley Tech. Fund Sec. Litig.*, 643 F. Supp. 2d at 369 n.2. We agree with that characterization. The gravamen of both actions is that defendants failed to disclose that the Morgan Stanley

broker-dealers affiliated with the Funds suffered from internal conflicts of interest, and, because the Funds' managers relied on these broker-dealers' stock research, the broker-dealers' conflicts increased the risk to investors associated with purchasing shares of the Funds.

**A. The Parties**

The lead plaintiffs in both actions purchased the Funds' shares during the class periods set forth in their pleadings.[1] Each defendant is a commercial entity that played a role in the Morgan Stanley enterprise, and each action bears the title of the mutual fund to which it relates.

Shares of the Info. Fund were publicly traded starting in 1995, and shares of the Tech. Fund were available to investors beginning in September 2000. In order to sell their shares to the public, both Funds registered their securities with the SEC by utilizing Form N-1A to file a series of registration statements and prospectuses

---

[1] The class period in the Info. Fund Action spans from October 25, 1999 through October 25, 2002; the class period in the Tech. Fund Action is defined as September 25, 2000 through July 31, 2002. The difference in these class periods is immaterial to our resolution of this appeal, and we therefore refer to them collectively as a single "Class Period."

(collectively, the "Offering Documents").[2]  The Info. Fund made four sets of filings between July 1999 and October 2002; the Tech. Fund made two sets of filings between August 2000 and July 2002.[3]

---

[2] The SEC created Form N-1A to facilitate registration by certain types of open-ended management investment companies under the Securities Act and the Investment Companies Act of 1940, 15 U.S.C. § 80a-1 *et seq.*  *See* SEC, Registration Form Used by Open-Ended Management Investment Companies; Guidelines ("Form N-1A Adopting Release"), Securities Act Release No. 33-6479, Investment Company Act Release No. 13,436, 48 Fed. Reg. 37,928, 37,929 (Aug. 22, 1983).  The Form creates a three-part registration statement that is also sufficient to satisfy qualifying issuers' prospectus-related obligations under sections 5(b)(2) and 10(a) of the Securities Act, 15 U.S.C. §§ 77e(b)(2), 77j(a).  *See* Form N-1A Adopting Release, 48 Fed. Reg. at 37,929.  First, in order to avoid prospectus disclosures that are "too long and complex," the Form calls for a streamlined, "simplified prospectus" and a "Statement of Additional Information," or "SAI," that is to be made available to investors upon request.  *Id.*  The purpose of the SAI is to offer issuers "the opportunity to provide more detailed discussions of matters required to be in the prospectus, as well as discussions of certain matters that are not required to be in the prospectus, but which may be of interest to at least some investors."  *Id.*  Finally, the third part of Form N-1A, referred to as "Part C," "pertains to information that is not required to be in the prospectus, but is required by the registration statement."  *Id.*

[3] The Info. Fund's four sets of Form N-1A filings were submitted to the SEC on July 27, 1999, May 30, 2000, May 30, 2001, and May 30, 2002.  The Tech. Fund's two sets of Form N-1A materials were filed on August 17, 2000 and October 31, 2001.  Plaintiffs have not identified material differences between any of these filings that are relevant to their claims.

The Offering Documents indicate that the "Investment Objective" of each Fund was to "seek[] long-term capital appreciation," which both Funds defined as "selecting securities with the potential to rise in price rather than pay out income." Each Fund disclosed a slightly different strategy for pursuing this objective. The Info. Fund indicated that it would "normally invest at least 65% of its total assets in common stocks and investment grade convertible securities of companies engaged in the communications and information industry located throughout the world." The Tech. Fund stated that it would "normally invest at least 80% of its assets in common stock of companies of any asset size engaged in technology and technology-related industries." The Funds also disclosed, using nearly identical language, that their managers had been granted "considerable leeway" to select both general trading strategies and specific investments for the Funds' portfolios.

The non-Fund defendants are the same in both actions. Defendant Morgan Stanley is a Delaware corporation that functions as a holding company and parent entity for each of the non-Fund defendants. Defendant Morgan Stanley

Distributors Inc. ("MS Distributors") served as the principal underwriter for each Fund. Defendant Morgan Stanley Investment Advisors Inc. ("MS Advisors") was the Funds' principal investment manager. MS Advisors subcontracted with defendant Morgan Stanley Investment Management Inc. ("MS Investment") to perform certain asset-management functions for the Funds, such as the purchase and sale of securities for their portfolios.

The final two defendants were Morgan Stanley's primary broker-dealer subsidiaries during the Class Period: Morgan Stanley & Co., Inc. and Morgan Stanley DW Inc. (collectively, "MS&Co."). Each is a registered broker-dealer. Both entities offered a variety of financial services relating to research, institutional and retail brokerage, corporate finance, and investment banking. Plaintiffs allege that, during the Class Period, both entities sold shares of the Funds to the public pursuant to a contract with MS Distributors.

**B. Plaintiffs' Allegations**

The thrust of plaintiffs' cases is that the Funds' Offering Documents unlawfully omitted certain information relating to the manner in which MS&Co. conducted its

operations, and that MS&Co.'s undisclosed conduct increased the risks associated with purchasing shares of the Funds. The central allegations are that defendants failed to disclose: (1) that there were conflicts of interest at MS&Co. that could potentially taint the objectivity of its stock research, and (2) that the Funds nevertheless relied on MS&Co.'s research, as evidenced by the proportion of securities in the Funds' portfolios from companies that were either covered by MS&Co.'s research analysts or being pursued by MS&Co. as potential investment banking clients.

With respect to the conflicts of interest at the Funds' affiliated broker-dealer, plaintiffs assert that MS&Co. intentionally dismantled the "Information Barrier" between its investment banking and research functions during the Class Period, and that defendants unlawfully failed to disclose that fact in the Offering Documents.[4] Following

---

[4] Although plaintiffs use the term "Chinese Wall," we use the term "Information Barrier" and intend it to have the same meaning. *See, e.g.*, SEC, Self-Regulatory Organizations; International Securities Exchange, Inc., Notice of Filing of Proposed Rule Change and Amendments No. 1 and 2 Thereto To Amend the Market Maker Information Barrier Requirements Under ISE Rule 810, Exchange Act Release No. 50,197, 69 Fed. Reg. 51,735, 51,735 (Aug. 13, 2004) (recommending that the phrase "Chinese Wall" be replaced with "Information Barrier" in the rules of the International Securities Exchange). The basic concept arose

this change, MS&Co.'s research analysts received compensation based partially on MS&Co.'s generation of investment banking revenue. The resulting conflicts of interest allegedly led these analysts to disseminate biased research reports that exaggerated the merits of investing in some of the securities issued by MS&Co.'s potential investment banking clients. Such reports, plaintiffs contend, artificially inflated the price of those securities to the detriment of the Funds (and, presumably, all investors using MS&Co.'s research).

In addition to the conflicts of interest arising out of MS&Co.'s compensation system, plaintiffs also allege that "[d]efendants" (without further specification) participated in "schemes" to "have research analysts issue false reports in order to obtain investment banking business" and to "manipulate the price of initial public offerings." With respect to their allegations of IPO manipulation, plaintiffs

---

out of regulatory concerns about the need to "segment the flow of sensitive information" within broker-dealers that provide a diverse package of financial services. *See, e.g.*, SEC, Div. of Market Reg., Broker-Dealer Policies and Procedures Designed to Segment the Flow and Prevent the Misuse of Material Nonpublic Information, at 2 n.5 (Mar. 1990), *available at* http://www.sec.gov/divisions/marketreg/brokerdealerpolicies.pdf.

incorporated into their pleadings the "specific facts" from "the approximately 303 complaints" filed as part of the consolidated Multi-District Litigation Panel action captioned as *In re IPO Securities Litigation*, No. 21 M.C. 92.

Plaintiffs also incorporated by reference the SEC's allegations in an enforcement action against MS&Co. relating to its lack of an Information Barrier during the Class Period. In 2002, following the close of the Class Period, nine brokerage firms agreed to a $1.4 billion global settlement with the SEC and other regulators relating to improper conflicts of interest that arose from the commingling of research and investment banking functions. *See* Press Release, Sec. & Exch. Comm'n, SEC, NY Attorney General, NASD, NASAA, NYSE and State Regulators Announce Historic Agreement to Reform Investment Practices; $1.4 Billion Global Settlement Includes Penalties and Funds for Investors, Release No. 2002-179 (Dec. 20, 2002), *available* http://www.sec.gov/news/press/2002-179.htm.[5] As part of the

[5] We may take judicial notice of the full contents of the SEC's filings relating to this enforcement action because plaintiffs rely upon portions of them in their pleadings and, in any event, these proceedings are a matter of public record. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147,

global settlement agreement, the implicated firms were required to "sever the links between research and investment banking" in order to "ensure that stock recommendations are not tainted by efforts to obtain investment banking fees." *Id.*

As part of the global settlement, the SEC commenced a separate enforcement action against MS&Co., which was filed in the Southern District of New York on April 28, 2003. *See* Press Release, Sec. & Exch. Comm'n, SEC Sues Morgan Stanley for Research Analyst Conflicts of Interest: Firm to Settle with SEC, NASD, NYSE, NY Attorney General, and State Regulators ("*MS&Co. Settlement Release*"), Release No. 18,117 (Apr. 28, 2003), *available at* http://www.sec.gov/litigation/litreleases/lr18117.htm. In that action, the SEC asserted that, between approximately July 1999 and 2001:

> Morgan Stanley engaged in acts and practices that created conflicts of interest for its research analysts with respect to investment banking activities and considerations. . . . As a result, Morgan Stanley research analysts were faced with a conflict of interest between helping generate investment banking business for Morgan Stanley and

---

152-53 (2d Cir. 2002); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991). We do not rely on the SEC's allegations for their truth, but "rather to establish the fact of such litigation and related filings." *Kramer*, 937 F.2d at 774.

> their responsibilities to publish objective research reports that, if unfavorable to actual or potential banking clients, could prevent Morgan Stanley from winning that banking business.

(Compl. ¶ 2, *SEC v. Morgan Stanley & Co. Inc.*, No. 03 Civ. 2948 (S.D.N.Y. Apr. 28, 2003).) MS&Co. consented to the entry of a final judgment in that action, which directed it to separate its investment banking and research functions, disgorge $25 million, pay a $25 million civil penalty, and spend $75 million over five years on independent research consultants for use by retail brokerage customers. (Consent of Morgan Stanley & Co., *SEC v. Morgan Stanley & Co. Inc.*, No. 03 Civ. 2948 (S.D.N.Y. Apr. 2003).)

Against this backdrop of allegations relating to MS&Co., plaintiffs assert that the Funds' reliance on MS&Co.'s research introduced additional investment risks associated with the purchase of the Funds' shares. Specifically, plaintiffs contend that the Funds were aware of the conflicts at MS&Co. because of their status as proprietary mutual funds under the Morgan Stanley umbrella, but that the Funds' managers nevertheless utilized MS&Co.'s research when making investment decisions for the Funds' portfolios. Plaintiffs argue that the Funds should have disclosed that these circumstances led to heightened

investment risks, and that the Offering Documents contained "numerous" material omissions relating to the Funds. However, the majority of the omissions that are alleged to have occurred relate to MS&Co., not to the Funds. Quoting from the pleadings, these omissions include that:

- "there was no [Information Barrier] between MS&Co.'s research department and its investment banking department";

- part of the compensation of MS&Co.'s research analysts was "based upon their securing/participation in investment banking business for MS&Co.," and the "objectivity of [MS&Co.'s] research reports . . . was inherently and materially tainted by" MS&Co.'s interest in developing investment banking business;

- MS&Co. either had, or was seeking to develop, investment banking relationships with "a material number of the companies whose securities were part of the [Funds'] portfolio[s]";

- "MS&Co. at times issued falsely positive research reports to enhance MS&Co.'s opportunity to maintain and obtain investment banking business from the company covered by the report"; and

- "defendants had inflated the market price" of securities in the Funds' portfolios "by conditioning allocations of shares in [an] IPO upon the requirement that customers agree to purchase additional shares of that security in the aftermarket, and, in some cases, to make those additional purchases at pre-arranged, ever escalating prices."

With respect to the Funds themselves, plaintiffs' principal allegation is that these events at MS&Co. made it

riskier to invest in the Funds. This is true, plaintiffs contend, because – notwithstanding their legal duties to the Funds' shareholders – the Funds' managers had an unspecified "material incentive" to cause the Funds to invest in "companies for which MS&Co. issued research reports and/or provided or was seeking to provide investment banking services." Plaintiffs further allege that the Funds should have specified in the Offering Documents that MS&Co. offered research coverage regarding approximately 76% of the securities in the Info. Fund's portfolio and 85% of the securities in the Tech. Fund's portfolio, and that MS&Co. had provided investment banking services for more than 30% of the companies in which the Funds had invested.

Plaintiffs assert that defendants were required to disclose all of this information in the Funds' Offering Documents under Form N-1A and the Securities Act. As to Form N-1A, plaintiffs rely on Item C of the Form's "General Instructions" and Items 2 and 4 of the "Information Required in a Prospectus" under Part A of the Form.

Item C(1)(b) of the General Instructions states:

> The prospectus disclosure requirements in Form N-1A are intended to elicit information for an average or typical investor who may not be sophisticated in legal or financial matters. The

> prospectus should help investors to evaluate the risks of an investment and to decide whether to invest in a Fund by providing a balanced disclosure of positive and negative factors. Disclosure in the prospectus should be designed to assist an investor in comparing and contrasting the Fund with other funds.

Item C(2)(a) states, in pertinent part:

> The purpose of the [Form N-1A] prospectus is to provide essential information about the Fund in a way that will help investors to make informed decisions about whether to purchase the Fund's shares described in the prospectus.

Plaintiffs also contend that Part A of Form N-1A, which relates to the "simplified prospectus" called for by the Form, required defendants to disclose the allegedly omitted information. Item 2, titled "Risk/Return Summary: Investments, Risks, and Performance," calls for, *inter alia*, a "Narrative Risk Disclosure" regarding "the principal risks of investing in the Fund, including the risks to which the Fund's portfolio as a whole is subject and the circumstances reasonably likely to affect adversely the Fund's net asset value, yield, and total return." Item 4, titled "Investment Objectives, Principal Investment Strategies, Related Risks, and Disclosure of Portfolio Holdings," calls for similar risk-related disclosures.

Finally, in addition to their reliance on Form N-1A,

plaintiffs argue that defendants were required by the Securities Act itself to disclose the allegedly omitted information in order to avoid rendering misleading the statements in the Offering Documents. *See* 15 U.S.C. §§ 77k(a), 77*l*(a)(2); *see also* 17 C.F.R. § 230.408. The statements in the Offering Documents on which plaintiffs rely in making this assertion relate to the Funds' investment objectives, investment strategies, and risks.

Based on these contentions, plaintiffs argue that they sustained damages from defendants' omissions that are measurable by a comparison of the Funds' performance during the Class Period relative to industry benchmarks such as the S&P 500 and the Nasdaq Composite Index. In the Info. Fund Action, the named plaintiffs claim that they lost approximately $280,000. The named plaintiffs in the Tech. Fund Action purport to have lost approximately $241,578. In total, plaintiffs assert that the losses sustained by their combined class of proposed claimants exceed one billion dollars.

**C. The SEC's Amicus Brief**

Prior to the oral argument relating to these appeals, the Court requested that the SEC submit an amicus curiae

brief expressing the Commission's opinion as to whether

> any part of Form N-1A [gave] rise to a duty owed by the defendants to disclose that: (a) the [Funds'] affiliated broker-dealer[] [MS&Co.] had ceased to maintain an Information Barrier between [its] research and investment-banking departments; and (b) the resulting organizational structure [of Morgan Stanley] may affect the investment strategy employed by the [Funds'] managers?

The Commission responded on November 12, 2009, and took the position that Form N-1A did not require disclosures relating to the dismantling of MS&Co.'s Information Barrier. First, the SEC reasoned that the "General Instructions" to Form N-1A, including Item C, are

> not an independent source of disclosure obligations. Rather, [the General Instructions] are intended to provide funds with general guidance as to the nature of the information they should provide in responding to specific disclosure items, and to the sorts of language, in terms of sophistication or technicality, that they should use in providing that information.

(Brief of the Securities and Exchange Commission, Amicus Curiae, In Support of Appellees on Issue Addressed ("SEC Amicus Br.") at 8.)

Second, the SEC turned to the risk-focused instructions cited by plaintiffs in Items 2 and 4 of the Form's Part A. The Commission characterized the risk to the Funds arising out of the deterioration of MS&Co.'s Information Barrier as

"generic" and asserted that "the fact of affiliation [between MS&Co. and the Funds] appears to be irrelevant" to the existence of such a risk. (*Id.* at 8-9.) Rather, "[t]his risk arises purely from the breach of the [Information Barrier] and has nothing to do with whether the broker-dealer is affiliated with the purchaser of the securities." (*Id.* at 8.) The SEC distinguished that "generic" risk from

> allegations that a fund's investment objectives included enhancing an affiliated entity's investment banking business, and that the fund's investment strategy was to achieve that goal by buying securities that the affiliated entity had underwritten . . . .

(*Id.* at 5-6.) With respect to this latter type of risk, the agency opined that "an investment objective and strategy of enhancing an affiliate's business by buying securities that the affiliate had underwritten would have to be disclosed" under Form N-1A. (*Id.* at 6.) However, the SEC reasoned that:

> [T]he danger that analyst reports (whether from affiliated or unaffiliated analysts) will be tainted by undisclosed conflicts of interest or actual corruption is but one of an indefinitely large number of factors that could cause a fund (or any other investor) to purchase overpriced securities, and it would not be useful to investors to require an attempt to set all of those forth in the prospectus.

(*Id.* at 10.)

## II. DISCUSSION

We review *de novo* a district court's dismissal of a complaint pursuant to Rule 12(b)(6). *Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir. 2004). When assessing the sufficiency of claims under sections 11 and 12(a)(2) of the Securities Act, the structure of the analysis is guided by a preliminary inquiry into the nature of the plaintiff's allegations. Where the claims are "premised on allegations of fraud," the allegations must satisfy the heightened particularity requirements of Rule 9(b) of the Federal Rules of Civil Procedure. *Id.* at 171. However, if the pleading does not sound in fraud, then Rule 8(a) governs. *See id.*

Defendants have not argued that the pleadings in these cases are subject to Rule 9(b). Therefore, notice pleading supported by facially plausible factual allegations is all that is required – nothing more, nothing less. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009). The district court conducted its analysis in a manner consistent with these principles, and dismissed plaintiffs' claims under

Rule 12(b)(6) because they failed to identify a legal basis requiring disclosure of the allegedly omitted information. For the reasons set forth below, we agree with the conclusion reached below and therefore affirm.

**A. Overview of the Applicable Law**

Sections 11, 12(a)(2), and 15 of the Securities Act impose liability on certain participants in a registered securities offering when the publicly filed documents used during the offering contain material misstatements or omissions. Section 11 applies to registration statements, and section 12(a)(2) applies to prospectuses and oral communications. 15 U.S.C. §§ 77k(a), 77*l*(a)(2).

Section 15, in turn, creates liability for individuals or entities that "control[] any person liable" under section 11 or 12. *Id.* § 77o. Thus, the success of a claim under section 15 relies, in part, on a plaintiff's ability to demonstrate primary liability under sections 11 and 12. *See, e.g.*, *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996). Because the district court's dismissal of plaintiffs' section 15 claims was predicated on their failure to state claims under sections 11 and 12, the latter two provisions warrant the bulk of our analysis.

Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC. *See* 15 U.S.C. § 77k(a). In the event of such a misdeed, the statute provides for a cause of action by the purchaser of the registered security against the security's issuer, its underwriter, and certain other statutorily enumerated parties. *Id.* To state a claim under section 11, the plaintiff must allege that: (1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *Id.*

Section 12(a)(2) provides similar redress where the securities at issue were sold using prospectuses or oral communications that contain material misstatements or omissions. *See id.* § 77*l*(a)(2). Whereas the reach of section 11 is expressly limited to specific offering participants, the list of potential defendants in a section

12(a)(2) case is governed by a judicial interpretation of section 12 known as the "statutory seller" requirement. *See Pinter v. Dahl*, 486 U.S. 622, 643-47 & n.21 (1988); *see also Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124, 1125-26 (2d Cir. 1989). An individual is a "statutory seller" — and therefore a potential section 12(a)(2) defendant — if he: (1) "passed title, or other interest in the security, to the buyer for value," or (2) "successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve his own financial interests or those of the securities['] owner." *Pinter*, 486 U.S. at 642, 647; *see also Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988).[6] As a result of this interpretation and the remaining statutory text, the elements of a *prima facie* claim under section 12(a)(2) are: (1) the defendant is a

---

[6] No defendant has argued on appeal that it is not a proper party to any of plaintiffs' claims. The defendants in plaintiffs' section 11 claims — the Funds, as issuers, and MS Distributor, as an underwriter of the Funds' shares — appear to be permissible parties under the statute. *See* 15 U.S.C. § 77k(a). The defendants in plaintiffs' section 12(a)(2) claims are the Funds, Morgan Stanley, MS&Co., MS Distributor, MS Advisors, and MS Management. It is unclear from plaintiffs' allegations that each of these defendants satisfies the "statutory seller" requirement, but that issue has not been raised by the parties and we need not address it in light of our broader holding.

"statutory seller"; (2) the sale was effectuated "by means of a prospectus or oral communication"; and (3) the prospectus or oral communication "include[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77*l*(a)(2).

Claims under sections 11 and 12(a)(2) are therefore Securities Act siblings with roughly parallel elements, notable both for the limitations on their scope as well as the *in terrorem* nature of the liability they create. *See Pinter*, 486 U.S. at 646; *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 & n.12 (1983). Issuers are subject to "virtually absolute" liability under section 11, while the remaining potential defendants under sections 11 and 12(a)(2) may be held liable for mere negligence. *Huddleston*, 459 U.S. at 382.[7] Moreover, unlike securities

---

[7] More specifically, section 11 provides several due diligence defenses available to non-issuer defendants, *see* 15 U.S.C. § 77k(b), and section 12(a)(2) contains a "reasonable care" defense, *id.* § 77*l*(a)(2). Defendants may also avoid liability under both provisions for damages based on the depreciation in value of a security that results from events other than misrepresentations or omissions. *See id.* §§ 77k(e), 77*l*(b). Generally speaking, defendants bear the burden of demonstrating the applicability of each of these

fraud claims pursuant to section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a *et seq.*, plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation. *See Rombach*, 355 F.3d at 169 n.4. Thus, in contrast to their "'catchall'" cousin in the Exchange Act – section 10(b), 15 U.S.C. § 77j(b) – sections 11 and 12(a)(2) of the Securities Act apply more narrowly but give rise to liability more readily. *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 433-34 (S.D.N.Y. 2009) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 206 (1976)); *see also Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 752-53 (1975).

In many cases – including this one – two issues are central to claims under sections 11 and 12(a)(2): (1) the existence of either a misstatement or an unlawful omission; and (2) materiality. The definition of materiality is the same for these provisions as it is under section 10(b) of the Exchange Act: "'[W]hether the defendants' representations, taken together and in context, would have

---

defenses, which are therefore unavailing as a means of defeating a motion to dismiss pursuant to Rule 12(b)(6).

misled a reasonable investor.'" *Rombach*, 355 F.3d at 172 n.7 (quoting *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991)); *see also DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003). However, because the materiality element presents "a mixed question of law and fact," it will rarely be dispositive in a motion to dismiss:

> "[A] complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."

*ECA v. JP Morgan Chase*, 553 F.3d 187, 197 (2d Cir. 2009) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000)); *see also United States v. Gaudin*, 515 U.S. 506, 512 (1995); *First Jersey Sec.*, 101 F.3d at 1466-67.

The district court did not rely on materiality in its decision, and the parties' arguments regarding this issue are unpersuasive at the pleadings stage. Nor have plaintiffs argued that the Offering Documents contained actual misrepresentations. Therefore, at the heart of this appeal lies the question of whether plaintiffs have identified an unlawful omission in the Funds' Offering Documents.

**B. The Sufficiency of Plaintiffs' Allegations**

Collectively, the language of sections 11 and 12(a)(2) creates three potential bases for liability based on registration statements and prospectuses filed with the SEC: (1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure obligation; and (3) an omission of information that is necessary to prevent existing disclosures from being misleading. *See* 15 U.S.C. §§ 77k(a), 77*l*(a)(2).[8] This appeal relates only to omissions. The question is whether, assuming the truth of plaintiffs' allegations, the Offering Documents omitted information that defendants were required to disclose. *See* *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002) ("For an omission to be actionable, the securities laws must impose a

[8] Whereas section 11 contemplates actions based on "[omissions of] material fact *required to be stated*" in registration statements, 15 U.S.C. § 77k(a) (emphasis added), section 12(a)(2) lacks parallel language regarding prospectuses and oral communications, *id.* § 77*l*(a)(2) (prohibiting only omissions of those facts "necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading"). *See Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1204 (1st Cir. 1996), *abrogated on other grounds by* 15 U.S.C. § 78u(4)(b)(2) (the Private Securities Litigation Reform Act). However, because we conclude that plaintiffs have not identified a legal basis requiring disclosure, we need not resolve the import of this distinction.

duty to disclose the omitted information."); *see also In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) ("[A]n omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts."). Two types of omissions can give rise to liability under these provisions.

**1. Affirmative Disclosure Obligations**

Plaintiffs first argue that the "General Instructions" of Form N-1A required defendants to disclose the allegedly omitted information. In support of this contention, plaintiffs rely on language from Item C of the General Instructions, which states that "[t]he prospectus disclosure requirements in Form N-1A are intended to elicit information for an average or typical investor who may not be sophisticated in legal or financial matters" and that "[t]he purpose of the prospectus is to provide essential information about the Fund." The district court rejected this contention, and we find no fault in its conclusion.

The Form's General Instructions suggest that the Funds were not precluded from providing additional information beyond that called for in the more specific instructions accompanying Parts A, B, and C. In addition to the language

relied on by plaintiffs, Item C(3)(b) states that "[a] Fund may include, except in the Risk/Return Summary [in Items 2 and 3 of Part A], information in the prospectus or the SAI that is not otherwise required." Consistent with this theme, Item C(1)(d) provides that "[t]he requirements for prospectuses included in Form N-1A will be administered by the Commission in a way that will allow variances in disclosure . . . if appropriate for the circumstances involved while remaining consistent with the objectives of Form N-1A." The SEC has also indicated in guidance accompanying the Form that, "in order to preserve registrants' flexibility, registrants . . . are generally free to include in the prospectus information in addition to that required by the specific items of the Form." *See* Form N-1A Adopting Release, 48 Fed. Reg. at 37,929. However, it is one thing to suggest that, based on this language, the Funds were *not prohibited* from providing additional information. It is entirely different to argue, as plaintiffs do, that defendants were *required* to make additional disclosures by the Form's General Instructions. The latter contention lacks support in the language of the Form.

To the extent there is any doubt about this issue, our conclusion is confirmed by the author of the Form. When faced with ambiguity in an agency promulgation, courts can — and often do — seek the interpretive opinion of the agency and defer to its views. *See, e.g., Press v. Quick & Reilly, Inc.*, 218 F.3d 121, 126-28 (2d Cir. 2000). Such deference is especially prudent here in light of the SEC's expertise in administering the securities laws, its ability to seek input from the public when crafting regulatory policy, and its relative political accountability. *See Bruh v. Bessemer Venture Partners III L.P.*, 464 F.3d 202, 207-08 (2d Cir. 2006); *cf. Resnik*, 303 F.3d at 154-55 (quoting *Lewis v. Vogelstein*, 699 A.2d 327, 332-33 (Del. Ch. 1997)).

We requested the SEC's opinion with respect to whether the General Instructions accompanying Form N-1A required defendants to make additional disclosures in the Funds' Offering Documents beyond those specified in the instructions relating to Parts A, B, and C of the Form. The SEC responded "no" to our inquiry, reasoning that the General Instructions "are not an independent source of disclosure obligations." (SEC Amicus Br. at 8.) It cannot be said that this interpretation of Form N-1A is "plainly

erroneous or inconsistent with the law." *Roth ex rel. Beacon Power Corp. v. Perseus L.L.C.*, 522 F.3d 242, 247 (2d Cir. 2008) (citing *Auer v. Robbins*, 519 U.S. 452, 461-62 (1997)); *Levy ex rel. Immunogen Inc. v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001); *Press*, 218 F.3d at 128. Therefore, the SEC's interpretation is entitled to deference. *See Auer*, 519 U.S. at 461; *DeMaria*, 318 F.3d at 175. And, because we find the SEC's view persuasive, we need not pause to determine the precise quantum of deference to which its opinion is entitled. *See Cmty. Health Ctr. v. Wilson-Coker*, 311 F.3d 132, 137-38 (2d Cir. 2002) (declining to "decide the exact molecular weight of the deference" due to an agency position). Accordingly, we hold that the General Instructions to Form N-1A did not require defendants to disclose the allegedly omitted information identified in the pleadings.

Plaintiffs next argue that defendants were required to disclose the omitted information under Items 2 and 4 of Part A of the Form, which relate to "principal risks" to be disclosed in a prospectus. Here, plaintiffs present a moving target of sorts, describing the allegedly omitted risks only vaguely, if at all, throughout their pleadings

and briefing. In their response to the SEC's amicus submission, however, plaintiffs clarified their position to some extent:

> [O]nce the [Information Barrier] between Morgan Stanley's investment banking and research operations was dismantled, the conflicts of interest that infected Morgan Stanley's research and investment banking departments created a new material risk in these Funds' portfolios that would have not have existed had the [Information Barrier] been maintained. Instead of investing in securities strictly on their merits, there was an increased risk that the Funds would disproportionately invest in and/or retain the securities of Morgan Stanley's investment banking clients/potential clients, without regard to whether they were good investments.

(Plaintiffs-Appellants' Brief in Opposition to Amicus Curiae Securities and Exchange Commission ("Pls.' Supp. Br.") at 7-8.)

At bottom, plaintiffs argue that the dismantling of MS&Co.'s Information Barrier augmented the risks associated with investing in the Funds because the Funds' managers utilized MS&Co.'s research when making investment decisions for the Funds' portfolios. The district court properly characterized this position as relying on the risk-related instructions in Part A of the Form, and it found that there were insufficient factual allegations to support an inference that the Funds' managers pursued investment

strategies that were designed to facilitate MS&Co.'s generation of investment banking revenue. *See In re Morgan Stanley Tech. Fund Sec. Litig.*, 643 F. Supp. 2d at 377. Plaintiffs have not challenged that conclusion, and, absent a more particularized contention, we decline to revisit this aspect of the district court's decision. *See, e.g.*, *Norton v. Sam's Club*, 145 F.3d 114, 117-18 (2d Cir. 1998). As such, this is not a case involving a situation in which "a fund's investment objectives included enhancing an affiliated entity's investment banking business," which, in the SEC's view, would have to be disclosed. (SEC Amicus Br. at 5.) Instead, the only question to be resolved is whether Form N-1A obligated defendants to disclose the allegedly omitted information as a "principal risk" of investing in the Funds.

Form N-1A's definition of "principal risk" is ambiguous in this regard. Hence, it is prudent to look to the SEC for interpretive guidance. In its amicus brief, the Commission characterizes the risk disclosures sought by plaintiffs as arising from "the danger that analyst reports . . . will be tainted by undisclosed conflicts of interest or actual corruption" at MS&Co., and asserts that "the fact of

affiliation" between MS&Co. and the other defendants "appears to be irrelevant." (*Id.* at 8, 10.) Based on these characterizations, the SEC opines that plaintiffs have only identified a "generic risk factor[] that [has] nothing to do with a specific fund," and – consistent with the decision below – that defendants were not required by Form N-1A to disclose this type of information. (*Id.* at 10.)

Not surprisingly, plaintiffs disagree. They first argue that this aspect of the SEC's amicus submission is entitled to "little if any deference" because it constitutes an "application" of Form N-1A rather than an "interpretation." (Pls.' Supp. Br. at 2.) We are, of course, mindful that the institutional considerations that may lead us to defer to the SEC's views on the interpretation of its promulgations counsel a different course when the question presented calls for an assessment of the sufficiency of a complaint. The task of construing a litigant's pleading rests firmly with the courts. Nevertheless, plaintiffs' distinction between an agency "interpretation" and an "application" is untenable and without support in our case law. In *Press v. Quick & Reilly, Inc.*, for example, we afforded deference to the

SEC's reasonable determination that the defendant broker-dealers in that case had satisfied their obligation to disclose third party remuneration under SEC Rule 10b-10. *See* 218 F.3d at 128-29. We see no basis discernible from *Press*, our other similar holdings, or this case that would allow us to draw a principled line between interpretations and applications of relevant agency promulgations. Therefore, we continue to adhere to our prior decisions and defer to the SEC's opinion so long as it is neither plainly erroneous nor contrary to law. *See, e.g., Beacon Power*, 522 F.3d at 247-48.

In further support of their position that the SEC's amicus submission is not entitled to judicial deference, plaintiffs argue that the agency "erroneously concluded that the facts omitted here . . . were not particular to the defendant Funds." (Pls.' Supp. Br. at 4.) Instead, plaintiffs argue that they "claim *only* that those funds affiliated with full-service investment banking firms, where the required Information Barrier ha[s] been dismantled and there are resulting research—investment banking conflicts of interest, are required to disclose these facts." (*Id.* at 5 (emphasis in original).) However, like the district court

and the SEC, we find unconvincing plaintiffs' attempt to recast the nature of the risk they have identified by limiting this case to its facts.

Consistent with the general guidance that accompanied the 1998 amendments to the Form, the SEC asserts that Form N-1A does not require disclosure of general risks that are present throughout the markets. Rather, the Form's instructions call for the disclosure of only those risks "to which the Fund's particular portfolio as a whole is expected to be subject." The SEC has also indicated, outside of this litigation, that it designed this requirement "to elicit risk disclosure *specific to that fund*." SEC, Final Rule: Registration Form Used by Open-End Management Investment Companies, Securities Act Release No. 7512, Exchange Act Release No. 39,748, Investment Company Act Release No. 23,064, 63 Fed. Reg. 13,916, 13,928 n.111 (Mar. 23, 1998) (emphasis added). In its amicus submission, the SEC takes the view that the risks identified by plaintiffs are not limited to the context presented by their factual allegations, and that systemic risks relating to the potential that a company's stock price is inflated by biased research coverage are present throughout the market. Put

differently, all investors, including the Funds' managers, face the risk that the research they use to make their decisions may be biased or flawed, and that the prices they pay for securities may not accurately reflect the securities' intrinsic value. In order to justify disregarding the Commission's conclusion, plaintiffs must persuade us that the omitted risks relating to investing in the Funds – not just the factual circumstances at Morgan Stanley or MS&Co. – are unique. Simply put, they have not done so.

Plaintiffs' allegations focus on the conduct of MS&Co. However, the pleadings do not suggest that there was anything untoward about the relationship between MS&Co. and the Funds, and there are no allegations that the internal problems at MS&Co. directly affected the manner in which the Funds' managers approached investment decisions.[9] The

---

[9] The SEC has already sanctioned MS&Co., and we do not understand its position in this litigation to condone the dismantling of MS&Co.'s Information Barrier. Nor do we perceive any inconsistency between the agency's position here and plaintiffs' perceptions of the SEC's "long-standing view of Information Barriers." (Pls.' Supp. Br. at 17 n.14.) Therefore, *American Federation of State, County & Municipal Employees v. American International Group, Inc.*, 462 F.3d 121 (2d Cir. 2006) is inapposite. Plaintiffs' suggestion to the contrary only serves to further illustrate the extent to which their claims place undue focus on events

affiliation between MS&Co. and the Funds was disclosed in the Offering Documents and is insufficient to bridge this gap. Without more, we see no basis in Form N-1A for requiring the Funds to complicate their public filings by making additional disclosures about the internal workings of a broker-dealer with only a limited role in the issuance of the securities that are the focus of this case, *i.e.*, the Funds' shares. "To demand more would open the door to unceasing and unreasonable clamorings for all manner of tutoring . . . , which would afford a bonanza to lawyers . . . with no corresponding benefit to the actual investor." *Greenapple v. Detroit Edison Co.*, 618 F.2d 198, 211 (2d Cir. 1980).

The flaw in plaintiffs' MS&Co.-focused tunnel vision is not remedied by their allegations relating to the proportions of securities in the Funds' portfolios issued by companies that were either covered by MS&Co.'s research analysts or utilizing MS&Co.'s investment banking services. Nothing about these facts changes the nature of the risks associated with utilizing MS&Co.'s research. *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 776 (2d Cir. 1991) ("It is

---

at MS&Co. rather than at the Funds.

in the *very nature of securities markets* that even the most exhaustively researched predictions are fallible." (emphasis added)). Additionally, plaintiffs have not alleged that MS&Co.'s recommendations relating to these companies diverged from the assessments of analysts outside of Morgan Stanley, or that the Funds' managers breached their legal duties to the Funds' shareholders by blindly and uncritically following MS&Co.'s potentially tainted recommendations. *See In re Morgan Stanley Tech. Fund Sec. Litig.*, 643 F. Supp. 2d at 378 n.6. Consequently, while one might infer from the pleadings that conflicts of interest affected MS&Co.'s research analysis of the companies in the Funds' portfolios, plaintiffs' allegations do not support an inference that the Funds' managers made investment decisions under circumstances that gave rise to unique, undisclosed risks relating to the Funds.

In seeking to implicate the Funds merely by virtue of their affiliation with MS&Co., plaintiffs also overstate the import of the inference that the Funds' managers knew that MS&Co. had dismantled its Information Barrier. Assuming, *arguendo*, that the pleadings support such an inference, plaintiffs have not alleged that the Funds' managers knew

that MS&Co.'s analysts had breached their professional obligations by disseminating biased or false research or manipulating IPOs. Affiliated or not, the Funds were not MS&Co.'s keeper, and defendants were not obligated to suggest — in the Funds' Offering Documents — that MS&Co.'s employees may have engaged in activities that might later be determined to run afoul of the securities laws. "[D]isclosure is not a 'rite of confession or exercise of common law pleading.'" *I. Meyer Pincus & Assocs.*, 936 F.2d at 762 (quoting *Data Probe Acquisition Corp. v. Datatab, Inc.*, 722 F.2d 1, 5-6 (2d Cir. 1983)). Defendants' knowledge of the lack of an Information Barrier at MS&Co. does not demonstrate that the allegedly omitted risks relating primarily to MS&Co.'s operations — however disconcerting they may be in a broader sense — were anything but run-of-the-mill insofar as Form N-1A is concerned.

To be clear, plaintiffs are not required under sections 11 and 12(a)(2) of the Securities Act to allege that defendants acted with scienter or intentionally omitted information from the Offering Documents. *See Rombach*, 355 F.3d at 169 n.4. The allegations regarding the extent of defendants' knowledge of MS&Co.'s activities are relevant,

however, to assessing the nature of the risks that plaintiffs have identified in their claims. The pleadings indicate that these risks arose because the Funds' managers purchased securities "in a market artificially inflated by [MS&Co.'s] falsely rosy analyst reports . . . [and] market manipulations." Plaintiffs have not persuaded us that such risks were unique to investing in the Funds, and they have not presented any other meritorious basis for attributing error to the SEC's opinion that defendants were not required to disclose this information as an investment risk under Part A of Form N-1A. Therefore, we defer to the persuasive view of the SEC, and hold that Items 2 and 4 of Form N-1A's Part A did not create a disclosure obligation that supports plaintiffs' claims.

**2. Duty to Avoid Misleading Statements**

Our conclusion that Form N-1A did not directly require defendants to disclose the allegedly omitted information does not mark the end of our inquiry. Sections 11 and 12(a)(2) both call for the disclosure of information that is necessary to avoid rendering misleading the representations in registration statements and prospectuses. *See* 15 U.S.C. §§ 77k(a), 77*l*(a)(2). SEC Rule 408, which applies to

filings on Form N-1A, establishes a similar requirement relating only to registration statements. *See* 17 C.F.R. § 230.408.

Citing these provisions, plaintiffs argue that the statements in the Offering Documents "concerning the Fund[s] and [their] investment strategy and principal risks triggered a clear duty to disclose all material information on the same or related subjects." They further contend that "the boilerplate disclosures" in the Offering Documents regarding the Funds' "principal investment strategies" and "principal risks" were rendered misleading by the absence of the allegedly omitted information.

These contentions misconstrue the nature of defendants' disclosure obligations and must be rejected.[10] When analyzing offering materials for compliance with the securities laws, we review the documents holistically and in

[10] The question that we presented to the SEC as part of our invitation to participate in this appeal as an amicus curiae focused on Form N-1A and did not relate to the issue of whether the alleged omissions rendered the Offering Documents misleading under Rule 408. This is because we see no ambiguity in the relevant language of the Securities Act or Rule 408 with respect to this issue. Thus, although our conclusion is consistent with the views expressed by the Commission, we have not deferred to this aspect of its amicus submission.

their entirety. *See, e.g., Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996). The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of "defendants' representations, taken together and in context." *DeMaria*, 318 F.3d at 180 (internal quotation marks omitted). Thus, when an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be "complete and accurate." *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992) (internal quotation marks omitted).

Plaintiffs' argument, however, stretches these principles past their logical breaking point. The Offering Documents' disclosures did not trigger a generalized duty requiring defendants to disclose the entire corpus of their knowledge regarding MS&Co. *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d at 267 ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact."). The SEC designed Form N-1A in an attempt to balance the costs and benefits of additional disclosures in the context of a specific class of issuers. Form N-1A Adopting Release, 48 Fed. Reg. at 37,928 (noting that the Form was intended to "provide guidance to

registrants and their counsel who may be concerned about

potential liability for material omissions from the

prospectus"). While defendants were required to make

complete and accurate disclosures regarding the principal

risks of investing in the Funds, these mandatory disclosures

did not obligate defendants to make disclosures relating to

the commonly understood risks associated with securities

research. *See id.* Consequently, we decline to hold that

defendants' disclosure of the information called for by Form

N-1A gave rise to a duty to make disclosures about "related

subjects" not called for by the Form.

In light of that conclusion, plaintiffs' remaining

arguments give us little pause. As stated above, plaintiffs

have not alleged that the Funds' managers pursued an

undisclosed objective or investment strategy when making

investment decisions for the Funds. Therefore, the Funds'

disclosures about these topics were not misleading.

Similarly, in light of our holding that plaintiffs have not

identified any undisclosed "principal risks" relating to the

Funds, it cannot be said that the Offering Documents' risk

disclosures were misleading because they omitted the generic

risks relied on by plaintiffs. Accordingly, we hold that

the Offering Documents were not rendered misleading as a consequence of the omissions that are alleged to have occurred.

## III. CONCLUSION

For the reasons set forth above, we conclude that plaintiffs have not identified any unlawful omissions in the Funds' Offering Documents. Therefore, their claims under sections 11 and 12(a)(2) of the Securities Act were properly dismissed. As such, we find no error in the district court's dismissal of plaintiffs' claims for control-person liability under section 15. We have considered plaintiffs' remaining arguments and find them to be without merit. Accordingly, the district court's February 2, 2009 order is hereby AFFIRMED.